Grafton,
June 3, 1930.

### WILLIAM H. CULLEN *v.* LITTLETON.

*Henry A. Dodge,* for the plaintiff.

*George W. Pike*, for the defendant.

BRANCH, J. The defendant, relying upon the rule laid down in *Hickey* v. *Berlin*, 78 N. H. 69, 72, contends that there was no evidence from which it could be found that the dangerous condition of the bridge had existed so long before the plaintiff's mishap that the defendant ought to have known of it in time to prevent the accident. We do not pass upon this question, because it conclusively appears that the plaintiff is barred from recovery by his own fault.

Under ordinary conditions, a highway traveler is entitled to act upon the assumption that the municipality has performed its duty of maintenance and that the way is in reasonably safe condition for use. He is not bound to anticipate danger nor must he be constantly on the lookout for unknown or latent defects when there is nothing to put him on his guard. 13 R. C. L., Tit: Highways, *s.* 386; note to *Lerner* v. *Philadelphia* (221 Pa. St. 294) in 21 L. R. A. (N. s.) 614, 621; note to *Knoxville* v. *Cain* (128 Tenn. 250) in 48 L. R. A. (N. s.) 628, 630. But obviously when a traveler knows that a highway is dangerous or when he knows of conditions that constitute a warning of unusual peril, there is no room for such an assumption, and he is then bound to exercise ordinary care to avoid any danger which he has reason to apprehend. 13 R. C. L. *ubi supra*; note to *Lerner* v. *Philadelphia, supra,* 622. If he knows that there is a probability of danger or "has notice or knowledge of such facts as ought to put him on enquiry," (*Hubbard* v. *Concord*, 35 N. H. 52) he cannot brave the dangers of the situation at the sole risk of the town. *Cofran* v. *Sanbornton*, 56 N. H. 12, 13. "Thus, if from foolhardiness one should . . . enter upon a bridge which he saw was weakened by a storm, he ought not to be indemnified for his carelessness." *Parker*, C. J. in *Thompson* v. *Bridgewater*, 7 Pick. 188, 189.

In the present case it is plain that the plaintiff's actual knowledge of conditions at the bridge was superior to that of the town officials and that the facts admittedly within his knowledge were such as to preclude any assumption on his part that the bridge was safe. He testified that he had crossed this bridge four times upon the morning of the accident, the first time about 7 o'clock when he was called to help rescue some sheep on the meadows about two miles down the river. These meadows were flooded at the time and the plaintiff said that he had never before seen the water so high. He crossed again about 7:30 on his return home to breakfast, again about 8:30 after breakfast, and again about 9 o'clock. During the forenoon before the

accident he was traveling around the village looking after oil burners which he had installed, and which were experiencing difficulty in operation because of the failure of electric power due to the flood. He testified that about 8:30 or 9 o'clock the fire alarm was rung and he found out that the trouble was caused by water coming into the houses on one of the streets known as Lafayette avenue. He also testified to the presence of water in another street known as Saranac street; that there was a "sag" in one of the buildings on this street known as "the tannery," which he thought might be caused by water, but that he paid no attention to the river bank at that point.    It thus appears that he had a comprehensive knowledge of the general flood conditions prevailing at the time, and it is plain from his testimony that he realized the possibility that the bridge might have been weakened by the action of the water.   Upon cross-examination he testified as follows:—   "Q. You had reason to believe that it was not right?  A. It wasn't by the results.  Q. You had reason then to believe that it was not all right?  A. Possibly might not be . . .   Q. You knew there might be danger? A. Yes."

Being possessed of this knowledge, the plaintiff says that when he turned onto Bridge street he reduced his speed to 10 miles per hour "to be sure everything was all right," but it does not appear that he did anything more than assure himself that the bridge was still in place.   When he reached a point from which he could observe the last 6 or 8 feet of roadway before reaching the bridge, he saw within this space a hole about 2 feet wide in the center of the way. He testified that this hole was located in a hollow place behind "a little hump" in the road and that the projecting end of the roof "shaded the end of the bridge considerably."   These factors were apparently relied upon to explain his failure to see the hole sooner than he did.   If they had the effect of obscuring the roadway the plaintiff was chargeable with knowledge of this fact, for he had been familiar with the bridge from childhood and had been accustomed to use it every day.   All of the evidence upon the subject came from him, and he testified that the depression near the entrance had existed for as much as three years.  When he saw the hole he applied his brakes and turned his car sharply to the left in an attempt to avoid the danger.   The action of the brakes was evidently insufficient to stop the progress of the car, for its front end was within 2 or 3 feet of the wooden structure of the bridge when the ground caved in under the rear wheels so that the rear end went down first.

In appraising the conduct of the plaintiff, it should be noted that

he did not act under compulsion. There is no suggestion in the testimony of any imperative reason why he should have undertaken to make this crossing when he did. There was another route by which he might have reached his home and by which he did reach it after the accident. He approached the bridge on a down grade at a speed of 10 or 12 miles per hour with the evident purpose of driving across without stopping or making any serious attempt to discover its true condition. With full knowledge that the last eight feet of the road before reaching the bridge were obscured from distant observation, he maintained a speed so great that he was unable to stop after discovering the condition which existed within this space. His conduct up to the moment when he saw the hole is consistent only with a determination to test the dangers of an attempted crossing, which were suspected if not known by him, regardless of consequences. This is not due care. On the contrary, such a disregard of eventualities is the essential element of recklessness. If the main span of the bridge had collapsed under him, all would agree that he had taken his chances on the condition of the structure and could not blame the town for his misfortune. The situation is not changed because the accident happened while he was on the approach to the bridge, for the statute would have no application if the approach were not a necessary part of the bridge. *Wilson* v. *Barnstead*, 74 N. H. 78; *Clark* v. *Hampton*, 83 N. H. 524. For the results of his rash conduct the town cannot be held liable. Other courts have reached the same conclusion in similar cases. *Homan* v. *County*, 90 Ia. 185; *Spencer* v. *Sardinia*, 59 N. Y. Supp. 412; *Kunkle* v. *County*, 219 Pa. St. 52.

*Exception overruled.*

All concurred.